MICAH L. RUBBO (CSBN 267465)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
San Francisco, CA 94102
micah.rubbo@usdoj.gov
Telephone: (415) 934-5300

Attorney for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WESLEY BARTA,<br><br>Defendant. | Case No. CR 4:13-00413 PJH<br><br>**UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. §5K1.1**<br><br>Date: December 15, 2017<br>Time: 9:00 a.m.<br>Court: Hon. Chief Judge Phyllis J. Hamilton |

    The United States respectfully requests that this Court sentence defendant Wesley Barta to (1) serve five months of custody, based on the government's motion for a substantial-assistance downward departure of 60 percent from the low end of the applicable Guidelines range; (2) serve three years of supervised release; and (3) pay a criminal fine of $7,500 and a $100 special assessment. This sentence is consistent with the parties' Fed. R. Crim. P. 11(c)(1)(A) and (B) plea agreement.

/ /

/ /

/ /

# BACKGROUND

Defendant Wesley Barta was an hourly employee of codefendant Michael Marr. Presentence Report (PSR) ¶ 14.  Although Barta had worked for Marr for many years in other capacities, in approximately June 2008 he began representing Marr at the foreclosure auctions. *United States v. Michael Marr, et al.*, Case No. CR 14-580 PJH (N.D. Cal.), Trial Tr. vol. 6, 1415-17.  On his first day of work, Marr attended the auction with Barta and instructed him that part of his job would be to participate in the bid-rigging conspiracies on his behalf. *Id*. at 1443-44.  Marr had been participating in the rounds himself but wanted to expand his business. *Id*. at 1444.  Marr demonstrated how the rounds worked and introduced Barta to the other members of the conspiracy. *Id*. at 1444-45.  After learning about the conspiracy, Barta told Marr that he was not comfortable participating in rounds. *Id*. at 1445-46; PSR ¶ 17.  Marr told Barta that he had no choice and it was part of his job. *Id*.  Because Barta needed to support his family, he agreed. PSR ¶ 17.

At first Barta attended both Contra Costa and Alameda County, but by the end of 2008 he was exclusively attending the Contra Costa auctions. *Id*. at 1417-19.  From June 2008 to January 2011, Barta attended the auctions on a daily basis and bid on properties on behalf of Marr and his clients. *Id.* at 1417-19, 1424-25.  While at the auctions, Barta was always in direct communication with Marr by phone. *Id*. at 1446-47; PSR ¶¶ 15-16.  Marr's authority was needed before Barta could make any decisions at the auctions.  For example, Marr directed Barta when and whether to agree to stop bidding at the public auction. *Marr,* Trial Tr. vol. 6 at 1449.  He directed Barta on whether and how much to bid at both the public auction and in the rounds. *Id*. at 1448.  Barta even needed Marr's authority to be the one to buy the property at the public auction in order to lead the round.  *See id*. at 1457.  In short, Marr dictated Barta's every move at the auction.  As Barta put it in the *Marr* trial, Barta "was just there at his beckon." *Id.*

Barta was also responsible for collecting and distributing round money on behalf of Marr. *Marr,* Trial Tr. vol. 7 at 1586.  On nearly a daily basis, Barta distributed payoff money as directed by Marr and collected payoff money from coconspirators to deliver to Marr. *Id*. at 1585-86.  Barta did not keep any portion of the round money. *Id*.  All the money was paid to

Marr. *Id*.

In total, defendant personally participated in rigging approximately 84 auctions in County Costa County on behalf of Marr. He purchased properties worth approximately $5.7 million through the conspiracy for Marr. Throughout this entire time period, Barta repeatedly reminded Marr that he was uncomfortable participating in rounds. *Marr,* Trial Tr. vol. 7 at 1654. Marr's response was always simply that it was a part of his job and "just do it." *Id*. But finally, in late 2009 or early 2010, Barta became so uncomfortable with this part of his job that he told Marr he would no longer participate in rounds. *Id.*

When questioned by the FBI at the beginning of the investigation, defendant admitted to participating in rounds on Marr's behalf. PSR ¶ 14. In June of 2012, defendant entered a guilty plea to one count of mail fraud and one count of bid rigging. In October 2016, that plea was withdrawn by stipulation, defendant entered a guilty plea to the bid-rigging count only pursuant to a revised plea agreement, and the mail fraud count was dismissed. Minute Entry, Doc. No. 28.

## ARGUMENT

**A.     Sentencing Guidelines Calculations**

### 1.     Criminal History

In Paragraph 12 of the Plea Agreement, the parties agree that defendant's Criminal History Category is determined by the Court. The PSR calculates defendant's Criminal History Category as I, since he has no prior criminal history. The United States agrees. PSR ¶ 37.

### 2.     Offense Level

The PSR calculates the total offense level as 13, consistent with the plea agreement. PSR ¶ 32. This calculation includes a one-level increase to the base offense level of 12 for conduct involving the submission of non-competitive bids, a two-level increase for a volume of commerce exceeding $1 million, and a downward reduction of two levels for acceptance of responsibility. U.S. Sentencing Guidelines Manual ("U.S.S.G.") §§2R1.1(b)(1) & (b)(2)(A), 3E1.1(a) (U.S. Sentencing Comm'n 2010).

Under the Guidelines, an offense level of 13 and Criminal History Category of I results in a sentence ranging from 12 to 18 months of imprisonment.

### 3. Fine and Restitution

The PSR calculates a fine range of $57,567 to $287,839, which is consistent with the plea agreement. PSR ¶ 74; U.S.S.G. §2R1.1(c)(1) (fine range shall be from one to five percent of the volume of commerce). The government agreed however to recommend a fine between $7,500 and $75,000, which was the fine range in the original plea agreement. The government recommends a $7,500 fine.

### B. Basis for Downward Departure for Substantial Assistance

Pursuant to Section 5K1.1 of the Guidelines, the government moves for a downward departure based on defendant's substantial assistance to the investigation. The government recommends a 60 percent reduction, resulting in a sentence of approximately five months. This is the government's highest recommendation for substantial assistance, reflecting the extraordinary cooperation provided by defendant in the investigation and prosecution of these cases over several years.

The first consideration is the timing of defendant's decision to plead guilty and cooperate. Defendant agreed to plead guilty at a midpoint in the investigation in 2013, but well before many of his coconspirators and before any of the indictments in the case. Significantly, he was the first – and only – person within Community Fund to plead guilty and cooperate in the investigation.

The government's recommendation is also based on the extent and value of the information provided by defendant during the investigation. Defendant sat for at least 10 interviews with the government. During those interviews, defendant provided corroborating information regarding the operation of the conspiracy, authenticated thousands of Community Fund records, and provided an account of various subjects' conduct in furtherance of the conspiracy. He also spent many hours meticulously identifying the handwriting of various employees at Community Fund.

Lastly, the downward departure recommendation reflects the extensive trial testimony provided by defendant in the prosecution of the *Joyce*, *Guillory*, and *Marr* trials. He also made himself available to testify in the *Victor Marr* trial, though he was not ultimately called as a witness. As the Court is aware, defendant's trial testimony was particularly instrumental in the

*Marr* trial.  He was the only witness who could provide insight into the inner workings of the Marr organization and provided the foundation for the introduction of hundreds of highly incriminating Community Fund records.  The government is mindful that this was a particularly difficult task for defendant Barta because of the close relationship he shared with the defendants on trial.  In all three trials, his testimony was credible, accurate, and reliable.  The summary charts and demonstratives introduced through defendant in all three trials reflected many hours of preparations during which he carefully reviewed and summarized Community Fund records for hundreds of transactions.

For these reasons, a 60 percent downward departure for substantial assistance to the investigation and prosecution of these cases is appropriate.

**C.     Sentencing Recommendation**

The government's recommendation of five months is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553.  The most compelling factors weighing in favor of the recommendation are the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence to future bid-rigging offenses and white-collar crime generally, as the government has argued in the related cases.

However, an assessment of the history and characteristics of defendant should take into account certain mitigating factors previously identified by the Court for similarly situated individuals.  These factors include defendant's decision to accept responsibility and cooperate in the investigation, his status as a first-time offender, the fact that he did not personally profit from the conspiracy but acted on behalf of his employer, and that he was only charged in one county.[1]  While the government is recommending custody here, as it has in all the related cases, these factors have led the Court to impose probationary sentences for other defendants.  These factors apply with equal if not greater force to defendant Barta.

//

---

[1] Another factor the Court has considered is the defendant's willingness to pay restitution.  Barta's plea agreement does not require him to pay restitution because he did not receive any of the illegal payoffs and therefore did not owe any restitution.  The government therefore sought restitution from his employer Michael Marr.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court sentence defendant Wesley Barta to (1) serve five months of custody; (2) serve three years of supervised release; and (3) pay a fine of $7,500 and a $100 special assessment.

Dated: December 8, 2017　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　_____/s/_____
　　　　　　　　　　　　　　　　　　　　　MICAH L. RUBBO
　　　　　　　　　　　　　　　　　　　　　United States Department of Justice
　　　　　　　　　　　　　　　　　　　　　Antitrust Division